# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT


## 12-229


## STATE IN THE INTEREST OF E.M.M.


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. JC-20100077-A
HONORABLE MARILYN CARR CASTLE, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***


## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

**\*\*\*\*\*\*\*\*\*\***


Court composed of Ulysses Gene Thibodeaux, Chief Judge, Oswald A. Decuir, Jimmie C. Peters, Marc T. Amy, and James T. Genovese, Judges.

**AMY, J., dissents and assigns reasons.**

**REVERSED AND RENDERED.**

**Lloyd Dangerfield**
**703 East University Avenue**
**Lafayette, LA 70503**
**Telephone: (337) 232-7041**
**COUNSEL FOR:**
    **Appellant - R. M. (Father)**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602-1747**
**Telephone: (337) 436-2900**
**COUNSEL FOR:**
    **Appellant - R. M. (Father)**

**Diane Elaine Cote**
**825 Kaliste Saloom Road**
**Brandywine I, Room 218**
**Lafayette, LA 70508**
**Telephone: (337) 262-1555**
**COUNSEL FOR:**
    **Appellee - State of Louisiana, Department of Social Services**

**Allyson Claire Melancon Prejean**
**P. O. Box 3862**
**Lafayette, LA 70502**
**Telephone:  (337) 291-9444**
**COUNSEL FOR:**
    **Appellee - A. M. (Mother)**

**Franchesca L. Hamilton-Acker**
**Acadiana Legal Service Corp.**
**P. O. Box 4823**
**Lafayette, LA 70502-4823**
**Telephone:  (337) 237-4320**
**COUNSEL FOR:**
    **Appellee - E. M. M. (child)**

**Michelle Breaux**
**Assistant District Attorney – 15th Judicial District Court**
**P. O. Box 3306**
**Lafayette, LA 70502**
**Telephone:  (337) 262-8654**
**COUNSEL FOR:**
    **Appellee - State of Louisiana**

**THIBODEAUX, Chief Judge.**

In this dispute, R.M. argues that the trial court erred by terminating his parental rights to E.M.M..  The trial court found that there were grounds for an involuntary termination.  Because this court finds the State failed to prove by clear and convincing evidence that there is no reasonable expectation that R.M.'s condition or conduct will improve in the near future and that the termination is in E.M.M.'s best interest, we reverse.

## I.

## ISSUES

We shall consider whether the State established by clear and convincing evidence that:

(1)    R.M. abandoned E.M.M. by failure to maintain significant contact where R.M.'s undisputed testimony was that he had substantial telephone contact with E.M.M. every two weeks;

(2)    R.M. failed to comply with the case plan where R.M. was the unoffending parent, the case plan included requirements for which there were no indications, and R.M. attempted to comply on several occasions with these unwarranted requirements; and,

(3)    R.M. abandoned R.M.M. by failing to provide significant contributions to E.M.M.'s care and support, and that termination of R.M.'s parental rights was in the best interest of E.M.M., where R.M. was in constant telephone contact with E.M.M., where before E.M.M. was taken into the State's custody he and R.M. enjoyed a good relationship, and where E.M.M.'s grandparents enjoyed a very close bond with the child.

## II.

## FACTS

In February of 2010, the maternal grandfather of three children, G.M., S.W., and E.M.M., gave possession of the children to the Department of Children and Family Services (DCFS).  In August of 2011, the State filed a petition for termination

of parental rights and certification for adoption. After a hearing in October of 2011, the mother's parental rights with regard to all three children were terminated. R.M. stipulated to the termination of his parental rights with respect to G.M. and S.W. as these were not his biological children. R.M. requested and was granted a continuance of the hearing regarding E.M.M., his biological child. R.M.'s biological paternity of E.M.M. was established in November 2010.

On December 1, 2011, the court held a termination hearing. The State offered testimony of Michelle Milburn, the case supervisor from June 2011. Milburn testified that R.M. received a case plan that required maintenance of employment and suitable housing, as well as payment of support and a submission to substance abuse evaluation and anger management courses. Milburn stated that R.M. failed to comply with the components of his case plan. Milburn also testified that she had no personal knowledge of the case until June 2011. The State did not offer testimony of the child welfare specialist, Danielle Eugene, who had personal knowledge of the case. While at the time of the hearing Eugene was no longer in DCFS's employ, no explanation for the failure to subpoena Eugene was provided.

The record contained a February 2010 affidavit of Michael J. Lewis, an employee of the Department of Social Services. The affidavit indicated that the mother was arrested for abuse of her husband, R.M., and was currently hospitalized for psychiatric reasons. The affidavit further stated that R.M. indicated he could not care for his children and neither could the other family members.

There was no specific indication in the record as to why substance abuse evaluation and anger management courses were included in R.M.'s case plan. Without any specifics, Milburn testified that "[b]ased on the assessment that was completed with . . . [both parents,] there was some violence in the home."

Milburn further testified that R.M.'s parents had regular visitation with E.M.M. and a close bond with their grandson. Apart from the regular and frequent

2

visitation, the grandparents took E.M.M. out of state for several days to watch R.M.'s brother play football in Alabama.

The January 2011 case report indicated that R.M. was in limited compliance with minimal progress. It also stated that R.M. maintained family visits. The report further mentioned that R.M.'s parents were contacted prior to the establishment of R.M.'s biological paternity, but they stated they could not care for the children because of the work schedule and health-related issues. After the R.M.'s paternity with respect to E.M.M. was established, the grandparents expressed an interest in caring for E.M.M. only. The report then stated that the decision was made to keep all three children together, and, therefore, the grandparents' request was denied. The grandparents disagreed with the agency's decision.

The July 2011 report revealed that R.M. was in limited compliance with his case plan. R.M.'s February 2011 drug screen came back positive for marijuana, and R.M. agreed to participate in the substance abuse evaluation. By this time, the agency made the decision to separate the children. The report stated that the grandparents were contacted, but they refused placement of the child. The report also stated that R.M. did not visit the children since December of 2010. During the meeting, the grandparents discussed their options and wishes to have continuous contact with the children.

During the December 2011 hearing, Milburn testified that R.M. was not the offending parent, and he attempted to participate in anger management in May of 2010. Milburn also admitted that R.M. attempted to sign up for anger management after the October 2011 hearing, and that his first class would have started on the day of the December hearing. Apparently, R.M. was advised to wait for the outcome of the court hearing before starting the class. Milburn provided no explanation as to why either the substance abuse or anger management requirements were originally included in R.M.'s case plan.

R.M.'s testimony revealed that at the time the State took custody of the children, he was traveling around the country installing cable for a company. He explained that he was paid cash and, therefore, could not provide his pay stubs. R.M. lived in hotel rooms shared with other coworkers. R.M. maintained constant telephone contact every two weeks with all of his children when either the children's mother had visitation or when his parents did. He explained that he stopped visiting the children because he was told by the child welfare specialist, Eugene, he could not do so when the goal of the case changed from reunification to adoption.

R.M. testified that he was hurt when he found out that only E.M.M. was his biological child. This revelation took a toll on him psychologically, and that was why he was procrastinating with the completion of his case plan. While R.M. was working in Texas, he attempted an anger management course. That attempt was unsuccessful because of his work schedule as well as transportation issues. The participation in the class would have involved travel to Houston, which was cost and time prohibitive. R.M. also enrolled in an on-line anger management course and paid $150.00 for it. He did not complete the course because he needed approval from DCFS.

R.M. testified he was a former marine and did not use drugs. He was randomly drug-tested during his employment, and he testified he sent the negative drug screen to Eugene. He explained that when he learned of the February 2011 positive drug test, he immediately left the residence where he inadvertently inhaled the marijuana smoke emitted by other residents.

R.M., after battling his psychological issues, came to the conclusion that he needed to get his son back, and that was why he decided to quit traveling with the cable company and to return to Lafayette. R.M. testified that his current boss gave him a trailer to live in. The trailer needed minor repairs. R.M. also provided a

4

verification letter of employment which stated he had been working since October 2011.

At the time of the hearing, R.M. was unable to move into the trailer because he did not have enough money for the utility deposits. Nevertheless, he was confident that he would be able to comply with all of the case plan requirements within six months, with the exception of anger management requirement, which takes twenty six weeks to complete.

## III.

## STANDARD OF REVIEW

In the cases of parental rights terminations, appellate courts review the trial courts' judgments for manifest error. *State in Interest of Q.P.*, 94-609 (La.App. 3 Cir. 11/2/94), 649 So.2d 512.

## IV.

## LAW AND DISCUSSION

> The people of Louisiana recognize the family as the most fundamental unit of human society; that preserving families is essential to a free society; that the relationship between parent and child is preeminent in establishing and maintaining the well-being of the child; . . . that the role of the state in the family is limited and should only be asserted when there is a serious threat to the family, the parents, or the child; and that extraordinary procedures established by law are meant to be used only when required by necessity and then with due respect for the rights of the parents, the children, and the institution of the family.

La.Ch.Code art. 101. Although this court reviews the trial court's judgment for manifest error, in termination cases, the State "bears the burden of establishing each element of a ground for termination of parental rights by clear and convincing evidence." La.Ch.Code art. 1035(A). Thus, the State must "present proof by clear and convincing evidence of the parents' failure to comply with all the enumerated

5

conditions relied upon in the specific paragraph(s) of LSA-Ch.C. Art. 1015."[1] *State in Interest of Q.P.*, 649 So.2d at 515 (citing *State in Interest of J*, 582 So.2d 269 (La.App. 1 Cir.), *writ denied*, 583 So.2d 1145 (La.1991)). Finally, "[o]f paramount concern in any case involving the termination of parental rights, is the best interest of the child." *In re H.R.K.*, 07-1310, p. 4 (La.App. 3 Cir. 3/26/08), 980 So.2d 200, 202 (citing La.Ch.Code art. 1039).

Of all the grounds listed in La.Ch.Code art. 1015, the following are the only ones upon which the trial court could have terminated the parental rights under the facts of this case: (1) abandonment by failure to maintain significant contact with the child; (2) failure to comply with a case plan; and, (3) abandonment by failure to provide significant contribution to the child's care and support. We now examine whether the State proved by clear and convincing evidence each element.

---

[1]The grounds for termination of parental rights listed in La.Ch.Code art. 1015 that are pertinent to this case are:

> (4) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
>
> (a) For a period of at least four months as of the time of the hearing, despite a diligent search, the whereabouts of the child's parent continue to be unknown.
>
> (b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.
>
> (c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.
>
> (5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

### (1) Abandonment by Failure to Maintain Significant Contact

A person's parental rights may be terminated because of "[a]bandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility" by failure "to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months." La.Ch.Code art. 1015(4)(c).

Here, the trial court clearly committed a manifest error by holding that the state proved by clear and convincing evidence that R.M. failed to maintain contact with E.M.M. R.M.'s undisputed and unrebutted testimony was that he had substantial telephone contact with E.M.M. every time his parents or E.M.M.'s mother visited the children, which was approximately every two weeks. R.M. also testified that his understanding, based on conversations with Eugene, was that he could not visit E.M.M. once the plan for the children was changed from reunification to adoption. The State chose not to contradict or rebut that testimony. Instead, Milburn admitted it was possible that R.M. visited and had telephone contact with E.M.M. when R.M.'s parents had their visits with E.M.M. Thus, the State's proof here falls short of the clear and convincing standard.[2]

### (2) Failure to Comply with the Case Plan

A person may also lose her or his parental rights if one year elapses since a child was removed from the parent's custody and "there has been no substantial parental compliance with a case plan . . . *and* despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home." La.Ch.Code art. 1015(5) (emphasis added).

---

[2]It falls short even of the preponderance of the evidence standard.

7

Here, R.M.'s case plan required him to undergo substance abuse evaluation, participate in a domestic violence/anger management program, obtain and maintain suitable housing and employment, and pay $25.00 per month per child in parental contributions. There is no indication in the record as to why R.M., as an admittedly unoffending parent, was required to undergo substance abuse evaluation and anger management. Requiring R.M.'s participation in anger management is particularly inexplicable because it was E.M.M.'s mother who was arrested for abusing R.M. Therefore, this court does not consider R.M.'s failure to execute these requirements of his case plan particularly germane. To the contrary, we find that R.M.'s various attempts to complete the unjustifiable requirement of anger management indicate his strong desire to reunite with E.M.M.

Admittedly, R.M. failed to obtain and maintain suitable housing and employment due to his work with a cable company that required R.M.'s travel throughout the country. Nevertheless, at the time of the December hearing, the court possessed a letter written by R.M.'s current employer that showed that R.M. had been working for a local company for at least one month. R.M. also testified that his current employer provided him with a trailer that was in need of minor repairs and that R.M. was certain this trailer would provide a suitable shelter within six months.

Furthermore, unlike the trial court, this court is not deaf to R.M.'s pleas that he was affected psychologically by the revelation that only E.M.M. was his biological son and that it took him some time to adjust to that fact. Moreover, given difficult economic conditions that currently exist in the country, we find the trial court's pronouncements that it was R.M.'s choice to accept an out-of-state employment inappropriate. It is obvious that very few people have the luxury of *choosing* their employment. This dynamic is particularly pronounced in tough economic conditions when most working people accept whatever employment they can get.

8

Finally, we find manifestly erroneous the trial court's statement that R.M. "has not, until the last couple of weeks, done anything at all toward working his case plan." R.M.'s constant contact with E.M.M. and his attempts to participate in anger management courses despite the lack of any reason for that requirement reveal, at the very least, that R.M. attempted to comply with the case plan. R.M.'s testimony and evidence regarding his psychological improvement, local employment, and the possession of a trailer certainly show that there is a reasonable expectation of significant improvement in his condition or conduct in the near future.

### (3) Abandonment by Failure to Provide Significant Contribution to the Child's Care and Support & the Best Interest of the Child

When a child is in physical custody of a nonparent, a person's parental rights may be terminated because of abandonment by failure to "to provide significant contributions to the child's care and support for any period of six consecutive months" as of the filing of the petition. La.Ch.Code art. 1015(4)(b). Nevertheless,

> failure or even refusal of the parent to support a child is not sufficient cause to justify a decree of abandonment; . . . the evidence must clearly show a manifestation of intent to permanently avoid all parental responsibility; and all reasonable doubt should be resolved against entering such a decree which is in derogation of the natural rights of legitimate parents.

*In interest of Shumaker*, 341 So.2d 583, 585 (La.App. 2 Cir. 1977) (citations omitted). Thus, the court must view the parent's failure to provide support in light of other factors. *Id.* The failure to support *and* the other circumstances of the case must show parental intention to permanently avoid all parental responsibilities. *Id.* "The burden is on the state to prove affirmatively both of the above requisites before the parent will be held to have forfeited his parental right to the child." *Id.* at 585.

So essential is the preservation of family in our society and so limited is the role of the State in family matters that the State must further prove "the best interest of the child dictates termination of parental rights. Termination of parental

9

rights is a severe and permanent action which must be scrutinized very carefully." *State in Interest of H.D.*, 98-953, p. 5 (La.App. 4 Cir. 11/4/98), 721 So.2d 1045, 1047 (citing *State in Interest of Four Minor Children v. D.W.*, 585 So.2d 1222 (La.App. 2 Cir. 1991); *State in Interest of Z.D.*, 95-1680 (La.App. 4 Cir. 2/15/96), 669 So.2d 1312). Thus, even when the evidence clearly and convincingly shows that there are grounds for termination, "a court should not terminate parental rights unless termination is found to be in the child's best interest." *State ex rel. L.R.S.*, 38,812, p. 6 (La.App. 2 Cir. 6/23/04), 877 So.2d 1040, 1045 (citing *State in the Interest of J.M., J.P.M. and M.M.*, 02-2089 (La. 1/28/03), 837 So.2d 1247).

R.M. admitted that as of the time the State filed the petition for termination he failed to provide contributions to E.M.M.'s care and support. Therefore, the questions for the trial court were whether this failure combined with R.M.'s other actions manifested R.M.'s intention to permanently avoid all parental responsibility and whether the termination would be in the best interest of E.M.M. We conclude that the trial court manifestly erred in its conclusions.

Certainly, whether a parent intends to permanently avoid all parental responsibility is a fact-sensitive question. Nevertheless, our jurisprudence provides some guidance as to what parental behavior justifies termination. For example, a termination was warranted where the mother was unable to stop her drug habit, was incarcerated repeatedly, did not show adequate attempts to visit her children, and was unable or unwilling to provide an adequate home for the children. *State in the Interest of H.D.*, 98-953 (La.App. 4 Cir. 11/4/98), 721 so.2d 1045.

On the other hand, the second circuit held that the mother did not manifest an intention to permanently avoid parental responsibilities where, after initially making fourteen weekly payments, the mother, who was never under a court order to make the support payments, showed apparent lack of concern for her daughter for fifteen months. *In interest of Shumaker*, 341 So.2d 583. The mother

wrote letters to the agency inquiring about her daughter and explaining her various misfortunes that resulted in her inability to make further payments, including loss of a job and litigation in another state trying to regain custody of her other two children. *Id.*

Here, there is no clear and convincing evidence that R.M. intended to permanently avoid all parental responsibilities. R.M.'s failure or even refusal to pay the support payments is just one of the many factors the court must consider to determine whether R.M. intended to avoid all responsibilities. We note that like the mother in *In interest of Shumaker,* R.M. was not under the court order to make the support payments. Furthermore, R.M. was present at both termination hearings, showing concern for E.M.M.'s future. As previously discussed, R.M. made various attempts to comply with his case plan. All of these circumstances demonstrate R.M.'s intent to reunite with his child, not to permanently avoid all parental responsibilities.

Furthermore, R.M. testified that before the children were taken into the State's custody, he enjoyed a great relationship with all the children doing what most parents do, i.e., playing with them, taking them out fishing, and so on. There is evidence that R.M. was in constant contact with E.M.M. throughout this process. Furthermore, R.M.'s parents have a substantial and close relationship with E.M.M. The agency refused to place E.M.M. with the grandparents when they expressed the desire to have the child because, based on the reports, the agency did not want to separate the siblings. Yet, within less than four months of that decision, the agency separated the children anyway. This court finds these actions quite puzzling.

While we agree that R.M. has not behaved as a parent each of us should aspire to become, we are not unmoved by R.M.'s psychological and financial difficulties. Given that the family is a fundamental unit of human society and that the State's role is limited and should only be asserted when there is a *serious threat* to the family, the parents, or the child, this court concludes that based on (1) the relationship

11

among E.M.M., his grandparents, and R.M; (2) R.M.'s attempts to get his living and working arrangements in order; and, (3) R.M.'s improved state of mind, the trial court manifestly erred when it concluded the State proved by clear and convincing evidence that R.M. manifested an intention to permanently abandon E.M.M. and that it would be in the best interest of E.M.M. to have R.M.'s parental rights terminated at this time.

## V.
## <u>CONCLUSION</u>

Based on the above considerations, the trial court's judgment terminating R.M.'s parental rights with respect to E.M.M. is reversed.

All costs in the amount of $3,214.78 are assessed against the Department of Children and Family Services.

**REVERSED AND RENDERED.**

NUMBER 12-229

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

STATE IN THE INTEREST OF E.M.M.

AMY, J., dissenting.

I respectfully dissent from the majority opinion as I would affirm the trial court's judgment. In my opinion, the record supports a determination that the State produced clear and convincing evidence of grounds for termination under La.Ch.Code art. 1015(4) and/or (5).

With regard to La.Ch.Code art. 1015(4), the father's testimony, alone, reveals that he did not make significant contributions to the child's care and support for at least a consecutive six-month period before the petition for termination was filed. The father explained that, although he had income, he made no financial contributions. Instead, he admitted to only to a single $50 contribution submitted the week before the hearing. I find no evidence regarding the father's circumstances so compelling as to undermine the trial court's decision in this point.

As for the alternate ground of La.Ch.Code art. 1015(5), I believe that the trial court could have permissibly concluded that the father did not substantially comply with the case plan. Notably, the father did not maintain stable housing, did not complete certain domestic violence / anger management requirements, and did not tend to that component of his case plan addressing substance abuse. In fact, he tested positive for marijuana at one point and did not complete another test arranged by the case worker. Neither did he complete an initial substance abuse evaluation.

Obviously, I recognize the majority's concern that there be an appropriate underlying rationale for the substance abuse and domestic abuse related conditions

of the case plan. However, the case plan and its various components were reviewed by the trial court at the time they were approved. That issue is not now at issue on this appeal. Also, the record does, in fact, contain some background information on those requirements of the case plan questioned by the majority. Particularly, it reveals that the father was in a relationship with a substance abuser and, as indicated in the affidavit in support of the instanter order, the child's mother had been "arrested for domestic abuse on her husband." Thus, I see no need to revisit the necessity of each component of the case plan.

Further, I find the father's past history supports a conclusion that there is a lack of any reasonable expectation of significant improvement in his conduct in the future. *See* La.Ch.Code art. 1036(D)(3). Simply, the father failed to comply with the case plan and, only in the days before the hearing, did he begin representing an intent to prospectively satisfy those obligations. The trial court acted within its fact finding role in rejecting that representation in light of the father's pattern of conduct.

Finally, I believe that the record supports the conclusion that termination of parental rights is in the child's best interests. As recognized by the trial court, the child is in a secure placement. Also, the case worker explained that the foster parents are interested in pursuing adoption of the child.

For these reasons, I would affirm the trial court judgment.

2